## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| LICATA RISK & INSURANCE ADVISORS, INC. D/B/A LICATA RISK ADVISORS, )<br><br>Plaintiff, )<br>v. )<br>ROBERT ALLAIRE, )<br>Defendant. ) | Case No. 1:18-cv-10946-PBS |

**PLAINTIFF'S APPLICATION FOR TEMPORARY RESTRAINING ORDER, MOTION FOR PRELIMINARY INJUNCTION AND EXPEDITED NOTICE HEARING**

Pursuant to Fed. R. Civ. P. 65, The plaintiff, Licata Risk & Insurance Advisors, Inc., D/B/A Licata Risk Advisors ("LRA"), submits this Application for a Temporary Restraining Order and Motion for Preliminary Injunction. This action is commenced pursuant to, *inter alia*, the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, *et seq.* ("CFAA"), the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1831, *et seq.*, and attendant state-law claims, including alleged violations of M.G.L. c. 93, §42, *et seq.*, and M.G.L. c. 93A, §11, for misappropriation of trade secret information, against the defendant Robert Allaire ("Defendant"), in connection with LRA's proprietary information and trade secrets and Defendant's unauthorized access and use of information on LRA's network computer system. LRA seeks emergency injunctive relief pursuant to the CFAA, DTSA and M.G.L. c. 93 that:

(a)   Compels Defendant to hold and maintain the status quo regarding all electronically stored information ("ESI") or documents in his possession, custody and control, including any LRA ESI;

(b)   Compels Defendant to immediately surrender and produce of all of his cloud storage login and password information, personal computers, as well as all of his tablets or other personal electronic devices, including storage devices and smart phones, for immediate review, copying and imaging by LRA's computer forensics experts to itemize all LRA ESI stored in Defendant's computers and electronic devices and verify that Defendant has not transferred and/or improperly retained any proprietary, trade secret and/or confidential information belonging to LRA;

(c)     Authorizes LRA's forensic expert to erase any such itemized proprietary, trade secret, and/or confidential information and materials belonging to LRA found on Defendant's electronic device(s), or in cloud storage accounts to which he has access, in accord with Defendant's contractual agreement with LRA.

(d)     Prohibits Defendant from divulging or causing to be divulged, communicating or causing to be communicated, publishing or causing to be published, or otherwise disclosing or causing to be disclosed to any person, firm, corporation, association, or entity, using or exploiting for his own benefit or for the benefit of any other entity, or using in any manner which may injure or cause loss to LRA, any of the LRA's systems, designs, procedures, pricing and marketing strategies, concepts, technical information, trade secrets, know-how, customer lists, customer contacts, customer prospects, fee schedules, or business and financial records of LRA; and

(e)     Prohibits Defendant, until further order of the Court or until September 10, 2019 (the expiration of the contractual 1.5 years from Defendant's date of termination from LRA), whichever comes first:

(i)     directly or indirectly soliciting or attempting to solicit, diverting or attempting to divert, handling or attempting to handle, servicing or attempting to service the account or business of any customer, or prospective customer, of LRA, regardless of whether he dealt with the customer or prospect while employed by LRA;

(ii)    directly or indirectly hiring away or attempting to hire away or otherwise engage any employee, key advisor, or consultant of LRA; or

(iii)   directly or indirectly interfering or attempting to interfere in any way with the LRA's relationships with any person or entity which provides services or products to the LRA, including, without limitation, inducing or attempting to induce any such person or entity to terminate or to change the terms of its dealings with LRA.

LRA requests this relief in order to prevent LRA from immediate and irreparable harm until the merits of LRA's claims can be adjudicated upon a trial of the merits for permanent injunctive relief and money damages.  LRA respectfully requests that the hearing on this motion be scheduled for May 31 or June 1, 2018.  Undersigned counsel and counsel for Defendant have conferred and are both available those days and times.

## FACTUAL BACKGROUND

LRA is a risk management consulting and insurance advisory firm founded in 2001. Affidavit of Frank Licata ("Licata Aff."), ¶ 1.  It provides independent risk and insurance management consulting services, including identifying risks to businesses, establishing safety, security and other loss prevention programs, designing the specifications for and evaluating

insurance programs, evaluating agent and broker services, assisting in claims negotiation, providing claims audits, and assisting in insurance program monitoring and management. *Id.* LRA provides these services in multiple states. *Id.*, ¶ 2.

In the years since its founding, LRA has developed knowledge, systems, strategies, methods (including "proprietary methods of operation" described in LRA materials), marketing and sales concepts and materials, vendors, supply sources, customers, techniques and information, and other materials (collectively, the "Materials") about the risk management business that give it a competitive advantage and which, along with its financial data, constitute confidential trade secret information. Licata Aff., ¶ 5.

In or about late 2015, Defendant approached LRA's President and founder, Frank Licata, and asked for employment with LRA. *Id.*, ¶ 4. The Defendant and Licata knew each other from working at another risk management company many years prior. *Id.* The Defendant, however, had not been working in insurance risk management consulting for the prior five years and had neither relevant current clients nor contacts to bring to LRA. *Id.* Licata believed, however, that Defendant had some relevant prior experience and that, through the application of the Materials, Defendant might be able to generate sufficient revenue from new sales to offset a generous salary and benefit package. Licata Aff., ¶ 5.

### *The Defendant's Employment Agreement*

On January 14, 2016, Defendant executed a Non-Solicitation and Confidentiality Agreement (the "Employment Agreement") with LRA for the position as a Senior Risk Advisor. Licata Aff., ¶ 14. A true copy of the Employment Agreement is attached as **Exhibit 1** to the Licata Affidavit. *Id.* The Defendant's role for LRA at that time included both sales and service of LRA clients. *Id.*, ¶ 15.

By Defendant's signature on the Employment Agreement, Defendant indicated that he

3

read, understood and agreed to all of the provisions set forth therein. In particular, by signing

the Employment Agreement, Defendant agreed to devote his "full working time, skills,

knowledge and abilities to the business and affairs of" LRA (referred to as the "Company" in

the Employment Agreement) and to use his best efforts to perform all his duties for LRA.

Licata Aff., Ex. 1, ¶ 1.

 The Defendant further agreed to the following provisions:

(a) The Employee shall not, during the term of his employment by the Company and for
  a period of one and one half (1 1/2) years thereafter:

 (i) directly or indirectly solicit or attempt to solicit, divert or attempt to divert, handle
   or attempt to handle, service or attempt to service the account or business of any
   customer, or prospective customer, of the Company, regardless of whether he dealt
   with the customer or prospect while employed by the Company;
 (ii) directly or indirectly hire away or attempt to hire away or otherwise engage any
   employee, key advisor, or consultant of the Company; or
 (iii) directly or indirectly interfere or attempt to interfere in any way with the Company's
   relationships with any person or entity which provides services or products to the
   Company, including, without limitation, inducing or attempting to induce any such
   person or entity to terminate or to change the terms of its dealings with the
   Company.

(b) The Employee shall not, during the term of his employment and at any time thereafter
  divulge or cause to be divulged, communicate or cause to be communicated, publish
  or cause to be published, or otherwise disclose or cause to be disclosed to any person,
  firm, corporation, association, or entity, use or exploit for his own benefit or for the
  benefit of any other entity, or use in any manner which may injure or cause loss to the
  Company, any of the Company's systems, designs, procedures, pricing and marketing
  strategies, concepts, technical information, trade secrets, know-how, customer lists,
  customer contacts, customer prospects, fee schedules, business and financial records
  and such other information regarded by the Company as confidential and of a
  proprietary nature, or any Confidential Information (the "Proprietary Information").
  For purposes hereof, the term Proprietary Information shall not include information
  which (x) at the time of disclosure to Employee was generally known to the relevant
  trade so as to no longer be a protectable trade secret, or (y) was lawfully received by
  Employee from a third party who independently, without prompting or assistance by
  Employee, developed or acquired such Proprietary Information and was under no
  obligation, express or implied, to the Company with respect thereto or (z) at the time
  of disclosure was already properly in Employee's possession or otherwise known by
  Employee as evidenced by written documentation.

Licata Aff., Ex. 1, ¶ 2 at 2.

The Employment Agreement further provided, in pertinent part, the following with respect to breach or threat of breach of the foregoing provisions:

(c) The Employee hereby acknowledges that the Company's remedy at law for breach or threat of breach of the provisions of this Section 2 is inadequate and that the Company shall have the right to seek injunctive relief in the event of any such breach or threatened breach, in addition to any other remedy available. If any provision of this Section 2 shall be invalid or unenforceable to any extent or in any application, then the remainder of this Section and of such term and condition, except to such extent or in such application. shall not be affected thereby, and each and every term and condition of this Section shall be valid and enforced to the fullest extent and in the broadest application provided by law. If the invalidity or unenforceability is due to the unreasonableness of the time or scope or geographic extent of any covenant and restriction, said covenant and restriction shall nevertheless be effective for such period of time or within such scope or geographical area as may be determined to be reasonable by a court of competent jurisdiction. In the event it becomes necessary to enforce this agreement in court, the Employee, if found to have violated this agreement, shall also be responsible for the Company's costs of enforcement, including reasonable attorneys' fees.

Licata Aff., Ex. 1.

The Defendant's obligations under this agreement survive and extend beyond his date of resignation or termination from LRA and the time restrictions are to be extended by the length of time that Defendant is in breach.  *Id*., ¶ 2(a) & (2)(d).

<u>*The Defendant's Performance Issues, Termination*</u>
<u>*and Conduct Related to the Materials*</u>

Within months of Defendant joining LRA, Defendant became increasingly argumentative, uncooperative and oppositional.  Licata Aff., ¶ 17. He placed himself in direct conflict with Licata by, among other things, calling Licata pejorative names and refusing or failing to carry out clear instructions *Id*.

The Defendant was demoted on or about December 15, 2017.  *Id*., ¶ 18.  After the demotion, Defendant was directed to facilitate the transfer of the account handling to another employee designated by LRA.  *Id*. The Defendant's role after December 15, 2017 was limited

to sales to new prospective clients. *Id*. Because his new role did not involve servicing existing clients, Defendant was not authorized to access existing client service files for any purpose not associated with his new job function. *Id*. On multiple occasions after his demotion, however, Licata overheard Defendant engaging in calls with clients that had the purpose of impeding the smooth transfer of servicing responsibilities to the new LRA employee designed to handle the accounts. Licata Aff., ¶ 19. Further, as detailed in subsequent allegations, Defendant was also later found to have engaged in unauthorized access of client service files after December 15, 2017. Licata Aff., ¶ 31. LRA terminated Defendant on or about March 10, 2018. *Id*., ¶ 20.

Multiple times leading up to his termination, Defendant inquired of LRA's information technology (IT) provider what data others would be able to see on the Dell computer in the office assigned to Defendant on LRA's premises. *Id*., ¶ 21. The Defendant was the only regular user of that computer and that office. *Id*. The computer in that office is networked to LRA's computer server, which is in turn linked to the Internet. *Id*. LRA's computer and network use the Internet frequently, including to access cloud storage providers LRA uses to store, access and use the Materials. *Id*. These cloud storage providers include "Google Drive" and "IronBox." *Id*. Google Drive and IronBox are cloud storage systems operating in interstate commerce by virtue of their utilization of and dependence upon the Internet.

On or about November 27, 2017, Defendant used his LRA computer and another LRA employee's login to sign into LRA's IronBox account. Licata Aff., ¶ 22. On that same day, Defendant downloaded a zip file from IronBox. *Id*. Zip files are typically used for large amounts of data. *Id*. The purpose of this activity appears to be in connection with secreting away information he would not wish LRA to know of, including the Materials and other LRA information made confidential in the Employment Agreement. *Id*. Defendant's actions constituted an unauthorized use of LRA's computer and systems. *Id*.

Prior to his termination, Defendant used LRA's computer to prepare a business plan (the "Business Plan") for an entity to be called Allaire Risk, LLC d/b/a Allaire Risk. *Id*., ¶ 23. A copy of the Business Plan is attached to the Licata Aff. as **Exhibit 2**. *Id*. On March 5, 2018, prior to his termination from LRA, Defendant established a Massachusetts domestic Limited Liability Company, "Allaire Risk LLC." *Id*. The Massachusetts Corporations Division Business Entity Summary for this entity is attached to the Licata Aff. as **Exhibit 3**. *Id*.

In the Business Plan, Defendant identifies that Allaire Risk would "Begin A/R with client relationships." Licata Aff., ¶ 24. Among those "relationships" listed are LRA clients Campanelli, Keith Construction, Leeder Management Co., LLC, the Green Company, and Horizons Management Associates LLC, among others. *Id*. The Business Plan sets forth "billings" of tens of thousands of dollars associated with these LRA clients. Licata Aff., ¶ 25.

In the Business Plan, Defendant indicated that one of the steps to accomplish was to "Email content and/or white papers to [a] database." *Id*. It also lists "Risk Advisors" (proper noun capitalization in original). *Id*. LRA does business as "Licata Risk Advisors." Licata Aff., ¶ 1.

LRA uses the marketing phrase "You love your insurance broker… but you love your company more" in promotional materials. *Id*., ¶ 26. The Defendant's Business Plan uses the phrase "your [sic] business in [sic] more important to you, your family and your employees than your broker relationship." *Id*.

Prior to his termination, Defendant used LRA's computer to create a compressed file containing an email archive file, as well as (it appears) a database containing details about at least some of LRA's clients and numerous prospects. Licata Aff., ¶ 27. Prior to his termination, Defendant began utilizing LRA's computer and cloud storage accounts to systematically access and copy or otherwise transfer the Material to preserve it for use in

connection with Allaire Risk. *Id*. The Defendant undertook steps designed to conceal his

activities. *Id*. These steps included requesting information from LRA's IT consultant designed

to ascertain what activities Defendant could engage in with minimal risk of detection. *Id*.

These steps also included Defendant causing more than four thousand electronic files and other

ESI he accessed (and may have copied, shared or otherwise caused to be stored for his later

use) be placed in the LRA computer "trash bin." *Id*. Among these files and ESI were the

Materials, including many files Defendant was not authorized to copy or use. Licata Aff., ¶ 28.

These included at least one iteration of a comprehensive database titled "rfa database." *Id*. This

file contains extensive LRA client contact and other information and constitutes part of the

Materials. *Id*.

On or about March 2, 2018, Defendant used LRA's computer system to email to his

own personal email address (rallaire636@gmail.com) containing a list of LRA prospects and at

least some clients and other valuable proprietary information. Licata Aff., ¶ 29. He also sent

that same day to the same address a list of LRA attendees to marketing breakfasts that LRA

regularly hosts. *Id*. These were both unauthorized uses of LRA's computer system. *Id*. The

Defendant's email passed through servers linked to the Internet and thus entered interstate

commerce. *Id*.

Over the three months leading up to his termination, Defendant began accessing LRA's

Google Drive account and sharing files from that account. Licata Aff., ¶ 30. The Defendant

was not authorized to share files for any purpose other than client service and Defendant was

no longer handling client service following his demotion on December 15, 2017. *Id*. The

Defendant began externally sharing documents from LRA's Google Drive on or about February

5, 2018, and shared more than 90 files *Id*., ¶ 31. This was not an authorized use of LRA's

computer system. *Id*. In the days leading up to his termination, Defendant's usage of his LRA

email address dropped off significantly.  Licata Aff., ¶ 32. This fact may support the

implication that Defendant was utilizing his rallaire636@gmail.com, or other personal email

address or messaging systems, to carry on electronic communications with LRA clients aimed

at undertaking actions violative of the Employment Agreement. *Id*. None of the Materials

Defendant took are excluded by the criteria set forth in the Employment Agreement, § 2(b).

Licata Aff., ¶ 33.

On or about April 4, 2018, an attorney for Defendant notified LRA's counsel in a letter

that "Mr. Allaire will no longer extend the courtesy to Mr. Licata of refraining from containing

his clients while we attempt to resolve this matter."  Licata Aff., ¶ 34.  Enclosed with the letter

was an earlier email dated March 29, 2018, listing LRA clients that Defendant wants to "take."

*Id*. Included in this list were several LRA clients that terminated their involvement with LRA.

*Id*. These included the Campanelli Companies, Keith Construction, Leeder Management,

Horizons Management and the Green Company.  *Id*.

Thereafter, these longstanding LRA clients began abruptly terminating their contracts

with LRA.  In in some instances, these LRA clients acknowledged in writing that they would

now be working with Defendant, in direct violation of the Employment Agreement.  Licata

Aff., ¶ 35. In a letter dated May 1, 2018, for example, Leeder Management Properties notified

LRA that it was terminating its relationship with LRA immediately.  *Id*. The stated basis was

"Our decision is based on our longstanding and productive relationship with Bob Allaire. We

have chosen to work with him moving forward." *Id*. A copy of this letter is attached as **Exhibit**

**4** to the Licata Aff. *Id*.

On or about April 13, 2018, Campanelli Associates Management Corporation (agent for

the Campanelli Companies), issued a notice that it was terminating its relationship with LRA.

Licata Aff., ¶ 36.  Thereafter, LRA received an email addressed to Defendant's LRA email

address indicating that Defendant is working with this client too.  *Id*. On or about April 17, 2018, Keith Construction also sent a termination letter indicating that it has chosen to work with Defendant. *Id*., ¶ 37. On May 23, 2018, Horizons Management e-mailed LRA that we have decided that we will be terminating our contract with your office and moving forward with Bob Allaire." *Id*.

Yet another LRA client, the Green Company, terminated its relationship with LRA prior to Defendant's termination from LRA.  *Id*., ¶ 38. This client sent an email to Defendant's LRA email address supporting the implication that it is working with Defendant on matters covered by the Employment Agreement.  *Id*. Specifically, in response to an LRA request for fees, on November 13, 2017, Green's Chief Financial Officer forwarded the email to Defendant's LRA email address with the comment "FYI."  *Id*.

In sum, Defendant accessed the Materials in connection with at least one of the clients that later terminated their relationship with LRA.  The Defendant also accessed at least one client file having nothing to do with Defendant's job duties either before or after his demotion.

LRA will be irreparably harmed in its relationship with its clients, its customer prospects and the marketplace in general, unless the equitable relief prayed for is granted. Licata Aff., ¶

## **ARGUMENT**

Courts evaluate the same criteria in determining whether to issue a temporary restraining order or a preliminary injunction. *See Largess v. Supreme Judicial Court for the State of Mass.*, 317 F. Supp. 2d 77, 81 (D. Mass. 2004); *Quincy Cablesystems, Inc. v. Sully's Bar, Inc.*, 640 F. Supp. 1159, 1160 (D. Mass. 1986). To prevail on a motion for a preliminary injunction, a movant must establish the following four factors:

(1) The substantial likelihood of success on the merits; (2) the potential for irreparable harm if the injunction is denied; (3) the balance of relevant impositions, i.e., the hardship to the non-movant if enjoined as contrasted with the hardship to the movant if no injunction issues; and (4) the effect (if any) if the court's ruling on the public interest.

*Air Line Pilot's Ass'n Int'l v. Guilford Trans. Indus. Inc.*, 399 F.3d 89, 95 (1st Cir. 2005).

At the preliminary injunction stage, a court need not conclusively determine the merits of the underlying claims with absolute assurance. *See Ross-Simons of Warwick, Inc., v. Baccarat, Inc.*, 102 F.3d 12, 16 (1st Cir. 1996).

## I.   LRA WILL LIKELY SUCCESS ON THE MERITS OF ITS CLAIMS

Licata Risk Advisors has demonstrated a likelihood of success on the merits of its central claims tied to its stolen proprietary information.

### A.  LRA Will Likely Succeed on Its CFAA and DTSA Claims.

Pursuant to 18 U. S. C. § 1030 (a)(4), anyone who "knowingly and with intent to defraud, accesses a protected computer without authorization, or exceeds authorized access, and by means of such conduct furthers the intended fraud and obtains anything of value… shall be punished…" 10 U. S. C. § 1030 (a)(4). Similarly, under § 1030(a)(5), anyone who: "intentionally accesses a protected computer without authorization, and as a result of such conduct, causes… loss to 1 or more persons during any 1-year period (and, for purposes of an investigation, prosecution, or other proceeding brought by the United States only, loss resulting from a related course of conduct affecting 1 or more other protected computers) aggregating at least $5,000 in value… shall be punished…" 18 U. S. C. § 1030 (a)(5)(A)-(B).

The evidence in this case indicates Defendant violated the CFAA.  First, there can be no dispute that Defendant's conduct constituted "access" under the CFAA. Defendant had access to LRA's complete computer system using LRA login credentials (*i.e.*, username and password) for the purpose of performing his job duties only.  Licata Aff., ¶ 21.  Second,

Defendant's conduct "exceed[ed] authorized access," when he violated his contractual

obligations to LRA and accessed the Materials for prohibited purposes including soliciting,

handling or servicing any current or former LRA customer or prospective customer. The CFAA

defines the phrase "exceeds authorized access" as meaning "to access a computer with

authorization and to use such access to obtain or alter information in the computer that the

accessor is not entitled so to obtain or alter." 18 U. S. C. § 1030(e)(6); *see also EF Cultural*

*Travel BV v. Explorica, Inc.*, 274 F.3d 577 (1st Cir. 2001).

> Whenever an employee breaches a duty of loyalty, or a contractual obligation, or
> otherwise acquires an interest adverse to the employer, their authorization to access
> information stored on an employer's computer terminates, and all subsequent access is
> unauthorized/exceeds the scope of authorization, whether or not the access is still
> technically enabled.

*Advanced Micro Devices, Inc. v. Feldstein*, No. 13-40007, 2013 WL 2666746, at *3 (D. Mass.

Jun. 10, 2013) (Hillman, J.)*; see also Guest-Tek Interactive Entm't, Inc. v. Pullen*, 665 F. Supp.

2d (D. Mass. 2009) (holding an employee who "surreptitiously transported thousands of…

computer files onto his personal USB device" and conspired to launch a new company violated

the CFAA).

Furthermore, Defendant violated the Employment Agreement and exceeded his

authority when he solicited, diverted or began handling the business (or attempted any of those

three activities) of any LRA customer or prospective customer.  The Defendant did so in breach

of his fiduciary obligations without Mr. Licata's permission or consent.

As such, Licata Risk Advisors is also likely to prove that it meets the CFAA's "damage

or loss" requirements. *See* 18 U. S. C. § 1030(e). Under the CFAA, "damage" is defined as

"any impairment to the integrity or availability of data, a program, a system, or information

that… causes loss aggregating at least $5,000 in value during any 1-year period to one or more

individuals…" 18 U. S. C. § 1030(e)(8). The term "loss" is defined as "any reasonable cost to

any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service" 18 U. S. C. § 1030(e)(11). In *EF Cultural Travel BV v. Explorica, Inc.*, 274 F.3d 577, 585 (1st Cir. 2001), the First Circuit reasoned that "Congress's use of the disjunctive 'damage or loss,' [in § 130(g)] confirms that it anticipated recovery in cases involving other than purely physical damage." The First Circuit further noted a party can show that it suffered a loss consisting of reduced business and harm to its reputation and goodwill. *See id*. at 850.

Here, Defendant's conduct has caused Licata Risk Advisors to suffer damages and loss aggregating well in excess of $5,000.  LRA's damages also include the cost of attorney's (and legal technology consulting) fees incurred in responding to the CFAA violation, which is in excess of $9,000 to date.  Licata Aff., ¶ 40.

Also, money damages cannot restore the harm to Licata Risk Advisors' business reputation and goodwill. *See EF Cultural Travel*, 274 F.3d at 584 (finding that a general understanding of the word "loss" would fairly encompass loss of business and good will among other things). LRA may potentially lose business from current or prospective customers. While the full extent of these losses are not readily quantifiable at this time it is uncertain that any eventual legal remedy can be collected against Defendant.   Accordingly, a temporary restraining order and a preliminary injunction should be granted. *See, e.g., EF Cultural Travel*, 274 F.3d at 577 (affirming grant of a preliminary injunction based on a violation of the CFAA); *Creative Computing v. Getloaded.com LLC*, 386 F.3d 930, 937-38 (9th Cir. 2004) (affirming trial court's broad injunction based on defendant's violation of, *inter alia*, the CFAA).

LRA is also likely to succeed on its DTSA claims. *See, e.g., Henry Schein, Inc. v. Cook*, 191 F. Supp. 3d 1072, 1077 (N.D. Cal. 2016) (granting in part an employer's request for a TRO on DTSA and other claims to prevent a former employee from accessing, using, or sharing any confidential data, and from soliciting, contacting, or accepting business from any of employer's customers assigned to her while she was employed); *see also* 18 U.S.C. § 1839(6) (defining "improper means" as "theft, bribery, misrepresentation, <u>breach or inducement of a breach of a duty to maintain secrecy</u>, or espionage through electronic or other means") (emphasis added).

The Materials include confidential information, such financial, business, and technical information such as customer lists, compilations, methods, techniques, processes and procedures. Licata Aff., ¶ 7. The Materials therefore constitute trade secrets. Such information is used in connection with LRA's products and services, which are offered in multiple states. Licata Aff., ¶ 7, ¶ 2.

LRA took reasonable measures to maintain the secrecy and confidentiality of such information, including by limiting access to its Google Drive and Iron Box, and by requiring employment contracts that prohibited, among other things, unauthorized access, uses and disclosure. Licata Aff., ¶ 8. Such information cannot be properly acquired or duplicated because of the limited number of individuals who can access the information, and the contractual limitations imposed on such individuals. Licata Aff., ¶ 9.

The Defendant was subject to such agreements (including the covenants set forth in the Employment Agreement) and had a duty to maintain confidentiality and not to use for his own purposes the materials that he had access to pursuant to his relationship with LRA. Licata Aff., ¶ 9. Such information derives independent economic value from not being generally known to, and not being readily ascertainable through proper means by others because such information is

extremely valuable to LRA, crucial to the operation of LRA's business, and, if availab10le to others, would enable them to compete with LRA to LRA's detriment.  Licata Aff., ¶ 10.

The Defendant knowingly and improperly obtained, used, and disclosed such trade secrets and confidential information in violation of his own duties, including but not limited to those provided in the Employment Agreement.  Licata Aff., ¶ 11. The Defendant continues to do so by converting LRA materials into business assets for Defendant, and by modifying or otherwise using LRA materials, customer lists, methods and techniques in ways that directly compete with LRA.  *Id.* The Defendant was aware that he improperly acquired LRA materials and began competing with LRA and handling, attempting to handle, service or attempt to service any customer or prospective customer of LRA.  *Id.*

As such, Defendant used improper means to acquire knowledge of the Materials, and, at the time of its disclosure and use knew or had reason to know that the trade secrets were acquired by improper means or acquired subject to a duty to maintain secrecy or limit use.

The Defendant's conduct constitutes knowing, willful, and malicious misappropriation. As a direct and proximate result of Defendant's wrongful conduct, LRA has been substantially and irreparably harmed in an amount not readily capable of determination.   Licata Aff., ¶ 13. Unless restrained by this Court, Defendant will cause further irreparable injury to LRA.

### B.  LRA Will Likely Succeed on Its Breach of Contract Claims

Under Massachusetts law, to prove a breach of contract claim a plaintiff must show: 1) existence of a valid and binding contract; 2) that the defendant breached the terms of the contract, and 3) the plaintiff has suffered damages from the breach. *Aspect Software, Inc. v. Barnett*, 787 F. Supp. 2d 118, 127-28 (D. Mass. 2011). "In order to create an enforceable contract, [i]t is a necessary requirement that [the] agreement… be sufficiently definite to enable the courts to give it an exact meaning." *Armstrong v. Rohm & Hass Co. Inc.*, 349 F. Supp. 2d

71, 78 (D. Mass. 2004), quoting *Williston on Contracts* § 4:18 (4th ed. 1990). Here, in

exchange for valuable consideration, the parties entered into the comprehensive and binding

Employment Agreement, expressly for the protection of business interests, including the

protection of proprietary, confidential, and trade secret information.   LRA, for the above-noted

reasons, is likely to succeed on its claim that Allaire breached that contract.

### C.  LRA Will Likely Succeed on Its Misappropriation of Trade Secret Claims

Massachusetts common law and M.G.L. c. 93 § 42 prohibit the misappropriation of

trade secrets. A trade secret is " anything tangible or intangible, or electronically kept or

stored, which constitutes, represents, evidences, or records a secret scientific, technical,

merchandising, production or managerial information, design, process, procedure, formula,

invention, or improvement." M.G.L. c. 266, §30(4). Massachusetts common law provides for a

remedy in tort for trade secret misappropriation. 'The crucial issue t be determined in cases

involving trade secrets… is whether the information sought to be protected is, in fact and in

law, confidential." *Jet Spray Cooler, Inc. v. Crampton*, 361 Mass. 835, 840 (1972). In

determining whether information is a trade secret or confidential in fact and in law, courts

consider:

> (1) the extent to which the information is known outside of the business; (2) the
> extent to which it is know by employees and others involved in the business; (3)
> the extent of measures taken by the employer to guard the secrecy of the
> information; (4) the value of the information to the employer and to his
> competitors; (5) the amount of effort or money expended by the employer in
> developing the information; and (6) the ease or difficulty with which the
> information could be properly acquired or duplicated by others.

*Jet Spray Cooler, Inc.*, 361 Mass. at 480.

Massachusetts courts have found that numerous business records are either confidential

or are trade secrets, including customer lists.  *See, e.g., J.T. Healy & Son, Inc. v. James A.*

*Murphy & Son, Inc.,* 357 Mass. 728, 736 (Mass. 1970) (including customer lists).   "[T]he essence of an action for the wrongful use of trade secrets is the breach of a duty not to disclose or to use without permission confidential information acquired from another." *Jet Spray Cooler, Inc.*, 377 Mass. at 165. Massachusetts case law "undoubtedly proscribes former employees from misappropriating the trade secrets learned during their former employment." *Harvard Apparatus, Inc., v. Cohen*, 130 F. Supp 2d 161, 174 (D. Mass. 2001).

Additionally, a person who "unlawfully takes, carries away, conceals, or copies, or by fraud or by deception obtains, from any person or corporation, with intent to convert to his own use, any trade secret," is liable under M.G.L. c. 93 § 42 for misappropriation of trade secrets. Here, Defendant plainly utilized LRA's customer list in order to convert it for his own use.

## II.   LRA Will Suffer Immediate and Irreparable Harm Absent an Injunction

Courts have found irreparable harm in situations such as the instant matter, where a former employee improperly obtains confidential customer information belonging to the movant and has begun to utilize that information for its benefit.  *See, e.g., Basicomputer Corp. v. Scott*, 973 F.2d 507, 511 (6th Cir. 1992) (holding that the defendant former employees had access to confidential customer information of the plaintiff, that they removed much of this information when they left for a competitor, that they promptly began contacting the plaintiff's customers after commencing work with a competitor, and that they had access to the plaintiff's pricing information and could use that information to underbid the plaintiff).  Further, the loss of customer goodwill often amounts to irreparable injury because the damages flowing from such losses are difficult to compute. *See Ferrero v. Associated Materials, Inc.*, 923 F.2d 1441, 1449 (11th Cir.1991). Also, the loss of fair competition that results from the breach of a non-competition covenant is likely to irreparably harm an employer. *See Overholt Crop Ins. Serv. Co. v. Travis*, 941 F.2d 1361, 1371 (8th Cir. 1991) (holding that irreparable harm can be

inferred from insurance sales representatives' breach of non-competition covenant).

Moreover, "[w]hen a plaintiff demonstrates likelihood of success on a misappropriation of trade secrets claim, it need not prove irreparable injury because such harm is presumed. *Echomail, Inc., v. Am. Express Co,*, 378 F. Supp. 2d 1, 4 (D. Mass. 2005). The use and disclosure of LRA's confidential information is, in itself, a form of irreparable harm. *See Aspect Software, Inc., v Barnett*, 787 F. Supp. 2d 118, 130 (D. Mass 2011).

## III.   THE BALANCE OF HARMS TIPS DECIDEDLY IN FAVOR OF LRA

If the Court grants the requested injunctive relief, no harm would result to Defendant because he agreed in the Employment Agreement that he would not solicit, divert, handle or service any LRA customer or prospect.  Licata Aff., Ex. 1 at ¶ 2(a)(i).  Though he's evidently doing so, he should not be for the 1.5 years he agreed to refrain from such activities.  Conversely, Licata Risk Advisors is immediately and irreparably harmed if Defendant is not enjoined and/or restrained.

Therefore, the balance of hardships tilts decidedly in favor of Licata Risk Advisors, and Licata Risk Advisors is entitled to the requested relief.

## IV.   ISSUANCE OF A RESTRAINING ORDER PROHIBITING THE ACTS THREATENED BY DEFENDANT WOULD BENEFIT THE PUBLIC INTEREST

A preliminary injunction is not appropriate unless there is "a fit (or lack of friction) between the injunction and the public interest." *Nieves-Márquez v. Puerto Rico*, 353 F.3d 108, 120 (1st Cir. 2003). The United States prohibits computer fraud and abuse. *See* 18 U. S. C. § 1030 *et seq*. Massachusetts clearly favors strong protections for trade secrets. *Jet Spray Cooler*, 377 Mass. at 166 n. 8; *see also* M.G.L. 93, § 42 et seq. Violations of these statutes are against the public interest.  *See also Aspect Software, Inc. v. Barnett*, 787 F. Supp. 2d 118, 131 (D. Mass. 2011) (granting preliminary injunction to enforce provisions of a non-solicitation

employment agreement and protect the plaintiff's trade secrets). Here, the record supports the issuance of a preliminary injunction to enforce the Employment Agreement and vindicate the purposes of the CFAA, DTSA and other relevant statutes.

## V.     THE COURT NEED NOT REQUIRE SECURITY IN THIS CASE

Here, LRA has considerable assets and is able to pay damages in the unlikely event the injunctive relief is found to have been improperly entered. Licata Aff., ¶ 3. As such, this Court need not require security. *See Cont'l Oil Co. v. Frontier Ref. Co.*, 338 F.2d 780, 783 (10th Cir. 1964) (affirming issuance of a preliminary injunction without a bond where the plaintiff "is a corporation with considerable assets and that it is able to respond in damages" if necessary); *see also Burger Chef Sys., Inc. v. Servfast of Brockton, Inc.*, 393 Mass. 287, 291 (1984) (citing *See Cont'l Oil Co.* with approval).

## CONCLUSION

WHEREFORE, for the above reasons, Licata Risk Advisors requests that this Court grant its Application for Temporary Restraining Order and Motion for Preliminary Injunction and issue the relief sought in the Proposed Order filed herewith and incorporated by reference.

## REQUEST FOR ORAL ARGUMENT

The movant respectfully requests oral argument on this foregoing application and motion at the earliest practicable point.

## L.R. 7.1 Certification

Undersigned counsel conferred with Defendant's counsel via a telephone conversation on May 29, 2018, and attempted in good faith, but failed, to resolve or narrow the issues presented by this application and motion.

Dated: May 30, 2018                    Respectfully submitted,

                                       INSURANCE ADVISORS, INC. D/B/A
                                       LICATA RISK ADVISORS,

                                       By its Attorney,
                                       /s/ Stefan L. Jouret
                                       Stefan L. Jouret, BBO # 656196
                                       JOURET LLC
                                       Two Center Plaza, Suite 610
                                       Boston, MA 02108
                                       (617) 523-0133 (telephone)
                                       (617) 507-2576 (facsimile)
                                       jouret@jouretLLC.com

## CERTIFICATE OF SERVICE

On May 30, 2018, I caused the foregoing and all associated papers to be served upon counsel for
the Defendant via the ECF system.

                                       /s/ Stefan L. Jouret